UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
HARRY NEWMAN, Administrator    )
Pendente Lite of the Estate    )
of Lauren B. Angstadt,         )
Deceased, et al,               )
          Plaintiffs,          )
                               )
v.                             )          C.A. No. 09-cv-10138
                               )
EUROPEAN AERONAUTIC DEFENCE    )
AND SPACE COMPANY EADS N.V.,   )
et al,                         )
          Defendants.          )
```

MEMORANDUM AND ORDER

WOLF, D.J.                                        March 30, 2010

       This action arises out of a February 2, 2007 crash of a Socata

TBM 700 aircraft near the New Bedford Regional Airport in

Massachusetts.  Three individuals died in this accident: Michael J.

Milot, a pilot; Peter John Karoly, a pilot and owner of the

airplane; and Lauren Angstadt, Karoly's wife.  Plaintiffs, who

initiated this suit on January 29, 2009, are the administrators

pendente lite of the decedents' estates.  In their complaint,

plaintiffs assert claims for breach of warranty, negligence, strict

liability, and punitive damages against several defendants,

including the defendants who filed the motions to dismiss now at

issue, SimCom International, Inc.[1] and SimCom, Inc.  ("the SimCom

_____

[1]The complaint names SimCom International, Inc., and SimCom
International, Inc., d/b/a SimCom Training Centers.  These named
defendants are the same entity.  Affidavit of Tracy Brannon

defendants"), and Socata North America, Inc.("Socata").  Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. §1332.  As described below, defendants' motions to dismiss the complaint for lack of personal jurisdiction are being allowed because the contacts between these defendants and Massachusetts are insufficient to satisfy the requirements of the Due Process Clause of the United States Constitution.


I.  Standard of Review for Questions of Personal Jurisdiction

     Once it has been challenged, plaintiffs have the burden of showing that the court has personal jurisdiction over each of the defendants.  See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002).  The extent of that burden depends on the trouble to which the defendants would be put by defending on the merits before the personal jurisdiction issue has been conclusively decided.  Usually, the plaintiff is required to make only a prima facie showing of jurisdiction, in which "the district court is not acting as a factfinder" but instead "accepts properly supported proffers of evidence by a plaintiff as true," provided that plaintiffs' jurisdictional pleadings do not "rely on unsupported allegations." Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992) (citations omitted).  The district court then "add[s] to the mix facts put forward by the defendants, to the extent they are uncontradicted," and on the basis of these facts

("Brannon Aff."), ¶2.

determines whether the plaintiff has made an adequate jurisdictional showing. <u>Daynard</u>, 290 F.3d at 51.  Applying the <u>prima</u> <u>facie</u> standard and denying the motion to dismiss "implicitly...order[s] that hearing and determination of the motion to dismiss be deferred until the trial." <u>Boit</u>, 967 F.2d at 676.

Where a court determines that it would be unfair "to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a <u>prima facie</u> showing," it may employ one of two alternative standards, the "preponderance of the evidence" standard or the "likelihood" standard. <u>Boit</u>, 967 F.2d at 676-77.  However, those standards are not called for here, where none of the proffered evidence is conflicting and no issues of credibility are presented. See <u>Foster-Miller, Inc. v. Babcock & Wilcox Canada</u>, 46 F.3d 138, 146 (1st Cir. 1995).  All parties and the court agree that the <u>prima facie</u> standard is most appropriate.


II.  <u>Factual Background</u>

All decedents were Pennsylvania citizens, as are those suing on their behalf.

A.   <u>The SimCom Defendants</u>

The SimCom defendants are the alleged providers of flight training to decedent Michael Milot.  Both SimCom defendants have their principal place of business in Orlando, Florida.  Affidavit of Walter W. David ("First David Aff."), ¶1; Brannon Aff., ¶1.

SimCom, Inc. is incorporated in Delaware.  First David Aff., ¶1.
SimCom International, Inc. is incorporated in Florida.  Brannon
Aff., ¶1.

Neither SimCom defendant has officers or employees in
Massachusetts, conducts business in Massachusetts, owns real estate
in Massachusetts, is registered to do business in Massachusetts,
has an agent for service of process in Massachusetts, has licenses
in Massachusetts, has advertising campaigns that specifically
target Massachusetts, or maintains telephone lines or bank accounts
in Massachusetts.  First David Aff., ¶¶ 6-11; Brannon Aff., ¶¶ 6-
11.  SimCom, Inc. does not conduct direct mailings to customers in
any state, including Massachusetts.  First David Aff., ¶11.  Nor
has it ever provided training for the Socata TBM 700.  First David
Aff., ¶5.

SimCom International, Inc., which has been wholly owned by
SimCom, Inc.,[2] since 1999, does provide training courses for the
Socata TBM 700.  Plaintiffs' Response to the Motion to Dismiss
Filed by Defendants SimCom International, Inc., and SimCom, Inc.
("Plaintiffs' Response to SimCom"), Ex. I ("SimCom
Interrogatories"), ¶¶16, 22.  Since March 1, 1999, SimCom
International, Inc., and Socata have had an agreement under which
SimCom is the only entity promoted by Socata to provide pilot or
maintenance training for the TBM 700 in North America.  Plaintiffs'

---

[2]Prior to July 14, 2006, SimCom, Inc. was known as Pan Am
International Flight Academy, Inc.  First David Aff., ¶2.

Response to SimCom, Ex. K.[3]   It also operates a website with the address www.simulator.com.[4]   <u>Id.</u> at ¶23.   This website is not interactive and does not support online ordering.   <u>See</u> Defendants SimCom, Inc., and SimCom International, Inc.'s Reply to Plaintiffs' Opposition to Motion to Dismiss ("SimCom Defendants' Reply"), Ex. 10, ¶15; Ex. 11, ¶¶15, 24.   SimCom International, Inc. engages in direct mailing to owners of aircraft in which it offers flight training, including to owners in Massachusetts, and communicates with its Massachusetts-based customers regarding scheduling and other administrative issues related to the trainings that it provides in Florida and Arizona.   SimCom Interrogatories, ¶3. Since July of 2008, SimCom International, Inc., has sent two sets of training materials to customers located in Massachusetts.[5]   <u>Id.</u>

---

[3]The plaintiffs characterize this agreement as "mandat[ing]...anyone who desired to operate a Socata TBM 700...to obtain their training at a SimCom facility."   Plaintiffs' Response to SimCom at 10. However, the exclusivity language of the agreement – that "SimCom shall...be the only entity promoted by Socata to provide pilot or maintenance Training for the [TBM 700] in [North America]" – does not support that contention.   <u>Id.</u>, Ex. K, Bates 00063.

[4]Prior to July 14, 2006, Pan Am International Flight Academy, Inc. also had a website: www.panamacademy.com.   SimCom Interrogatories, ¶23.   That website was sold in July, 2006.   <u>Id.</u>

[5]These contacts are relevant to the general, but not to the specific, personal jurisdiction analysis.   This is because a court assessing a defendant's contacts with the forum state under the specific jurisdiction analysis may only consider those contacts that occurred prior to the date upon which the claims accrued, which in this case is February 2, 2007.   <u>See</u> <u>Harlow v. Children's Hospital</u>, 432 F.3d 50, 61 (1st Cir. 2005).   In contrast, under the general personal jurisdiction analysis, the court may consider defendant's contacts with the forum state up until the date upon which the suit was filed.   <u>See</u> <u>Harlow</u>, 432 F.3d at 65.

Between 2000 and December 2008,[6] the percentages of SimCom International's customers who were located in Massachusetts, and the percentages of its total revenue that it derived from those customers, are as follows:

- 2000: 1.18% of customers;[7] 1.18% of revenue

- 2001: 1.82% of customers; 1.46% of revenue

- 2002: 1.67% of customers; 1.30% of revenue

- 2003: 1.53% of customers; 2.21% of revenue

- 2004: 1.62% of customers; 1.68% of revenue

- 2005: 1.52% of customers; 1.82% of revenue

- 2006: 1.63% of customers; 1.47% of revenue

- 2007: 1.36% of customers; 0.97% of revenue

- 2008: 0.98%[8] of customers; 0.64% of revenue

SimCom Interrogatories, ¶¶7, 19.  These percentages represent 146[9]

---

[6]This date range exceeds that which may be considered under the specific jurisdiction analysis.  See Harlow, 432 F.3d at 61, discussed supra, note 5.  However, because the court has no reason to believe that the percentage of business that SimCom International, Inc., derives from Massachusetts customers differs significantly from year to year, and because under the prima facie standard, the court must view the evidence in the light most favorable to the plaintiff, it assumes that 1.36% represents the percentage of total revenue that SimCom International, Inc., derived from Massachusetts customers between 2000 and February 2, 2007, the date the plaintiffs' claims accrued.

[7]The percentage of customers is based on the figures from July to December 2000 only.  SimCom Interrogatories, ¶7.

[8]The 2008 percentage is only relevant to the general personal jurisdiction analysis.  See Harlow, 432 F.3d at 61, 65.

[9]The plaintiffs misstate this figure as "over 450" in their Response.  See Plaintiffs' Response to SimCom at 6.  Plaintiffs acknowledged this error at the March 4, 2010 hearing.

of SimCom International's 12,092 customers during this time period (1.21%), and $2,615,889 of SimCom's total revenue of $192,441,619 (1.36%).  Id. at ¶¶1, 18; Plaintiffs' Response to  SimCom, Ex. J.

Between 2001 and February 2, 2007, a SimCom International instructor traveled to an airport in Massachusetts to provide training eleven times.  SimCom Interrogatories, ¶2.  SimCom International instructors made six additional visits to Massachusetts between February 2, 2007 and January 29, 2009,[10] for a total of seventeen visits to six Massachusetts-based customers between 2001 and January 29, 2009.[11]  Id.  The revenue derived from such trainings constitutes approximately .033% of SimCom International's total revenue since 2001.  Id. at ¶1.

In July, 2006, SimCom International, Inc., provided decedent Milot with an initial training course for the Socata TBM 700 at its training center in Orlando, Florida.  Brannon Aff., ¶5.  On July 14, 2006, it issued Milot a certificate stating that he had "satisfactorily completed a TBM700 Initial course in accordance with the standards of SimCom Training Centers."  Plaintiffs' Response to SimCom, Ex. 2.

---

[10]These visits may only be considered in the general jurisdiction analysis because they occurred after the date on which the plaintiffs' claims accrued, placing them beyond the scope of the specific jurisdictional analysis.  See Harlow, 432 F.3d at 65; n. 5, supra.

[11]The second affidavit of SimCom president Walter W. David states that the answers provided to the plaintiffs' SimCom Interrogatories misstated the number of Massachusetts customers as seven.  David Aff. 2, ¶14.

Both SimCom, Inc., and SimCom International, Inc., are owned by SimCom Holdings, Inc., in which J.W. Childs Equity Partners II, LP, is the majority stockholder.  Plaintiffs' Response to SimCom, Ex. B; Glenn A. Hopkins Affidavit ("Hopkins Aff."), ¶4; Walter W. David Affidavit 2 ("David Aff. 2"), ¶¶3, 8.   J.W. Childs Associates, L.P., is located in Boston, Massachusetts.  Plaintiffs' Response to SimCom, Ex. D.   John W. Childs, Chairman and CEO of J.W. Childs Associates, L.P., is a director of SimCom.[12]   Id.

---

[12]The plaintiffs argue that "[t]he purchase of SimCom International, Inc. specifically contemplated the J.W. Childs personnel maintaining substantial involvement in the control of SimCom." Plaintiffs' Response to SimCom at 3-4.  They cite in support of this statement the November 24, 1998 Stock Purchase Agreement's definition of "contemplated transactions" as "all of the transactions contemplated by this Agreement, including [] buyer's acquisition and ownership of the shares and exercise of control over the Acquired Companies."  Id. at 4; see also Plaintiffs' Response to SimCom, Ex. F, Bates 00098.  Plaintiffs also highlight the fact that the Agreement lists the Boston, Massachusetts address of J.W. Childs Associates, L.P. as the address to which all communications directed to "Buyer" must be delivered.  Plaintiffs' Response to SimCom at 5, Ex. F, Bates 00150.

However, inspection of the referenced Agreement reveals that it identifies the Buyer of SimCom International, Inc., not as J.W. Childs, but as Pan Am International Flight Academy, Inc.  See Plaintiffs' Response to SimCom, Ex. F, Bates 00092, 00097.  This is confirmed by uncontested affidavits submitted by the SimCom defendants.  See First David Aff., ¶2; Brannon Aff., ¶14.  These affidavits also confirm that Pan Am International Flight Academy was at that time owned by Pan Am International Flight Academy Holdings (the entity that became SimCom Holdings in 2006), in which J.W. Childs was and is the majority shareholder.  Nevertheless, the uncontested second affidavit of SimCom International, Inc., president Walter W. David states that the November 1998 Agreement "did not contemplate any substantive involvement, management or control by PAIFA/SimCom, or any J.W. Childs firm or personnel, with regard to the flight training business of SimCom International." Second David Aff., ¶8 (emphasis in original).  Thus, the plaintiffs' evidence to the contrary does not constitute the "affirmative proof" that plaintiffs must proffer for the court to accept the foregoing allegation as true under the prima facie

B.  <u>Socata</u>

Socata sells, services, and provides technical support for Socata aircraft. <u>See</u> Socata North America, Inc.'s Response to Plaintiffs' Requests for Production on the Issue of Personal Jurisdiction and on the Issues Raised in the Defendants' Rule 12(b)(2) Motion to Dismiss ("Socata Interrogatories"), ¶1.  It is incorporated in New York, and maintains its principal place of business in Florida.  <u>See</u> <u>id.</u>; Declaration of Nicolas Chabbert ("Chabbert Decl."), ¶2.  It is not licensed to do business in Massachusetts, has never had a registered agent for service of process in Massachusetts, has never had any employees based in Massachusetts, has never maintained any offices in Massachusetts, has never had any bank accounts in Massachusetts, has never had a Massachusetts telephone listing, has never paid taxes to Massachusetts, and has never owned any real or personal property in Massachusetts.  Chabbert Decl., ¶3.  Socata does not advertise or send mailings specifically targeted to people in Massachusetts, although it does advertise in national publications and online. Socata Interrogatories, ¶¶2, 9, 18.

Socata did not design, manufacture, or sell the aircraft in question.  Chabbert Decl. at ¶4.   However, Socata does conduct business with Massachusetts customers.  Between 1998 and January 29, 2009, Socata sent three employees to Massachusetts for Socata

standard.  <u>Chlebda v. H.E. Fortna & Bro., Inc.</u>, 609 F.2d 1022, 1024 (1st Cir. 1979).

business.  Id., ¶15.  Sales to Massachusetts customers constituted between 0.010% and 0.576% of Socata's total sales between January 6, 1998 and March 9, 2009,[13] for an average of approximately 0.2% of total sales between January 1998 and December 2008, or roughly $1.3 million.  Plaintiffs' Response to Defendant Socata North America, Inc. Motion to Dismiss Pursuant to Mass. [sic] R. Civ. P. 12(B)2 ("Plaintiffs' Response to Socata"), Ex. B, Bates 00073, Bates 00074 (filed under seal); Socata Interrogatories, ¶17.[14]

III.  Discussion

Because none of the defendants challenging this court's jurisdiction are alleged to be residents of Massachusetts, to own property here, or to have otherwise consented to this court's jurisdiction, personal jurisdiction is only appropriate if the defendants fall within the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A §3, and exercising jurisdiction comports with the requirements of the Due Process Clause.  See Evans Cabinet Corporation v. Kitchen International, Inc., 593 F.3d 135, 146 (1st

---

[13] For the purposes of the general jurisdiction inquiry, only the contacts through January 29, 2009 may be considered.  See Harlow, 432 F.3d at 65.

[14] Plaintiffs also state in support of their jurisdictional argument that Socata maintains a website, www.socata.com.  Plaintiffs' Response to Socata at 5.  While they do not cite any evidence to support this contention, Socata's response to the interrogatories put to it acknowledge the existence of a website.  Declaration of Eric Strain ("Strain Decl."), Ex. A, ¶¶44, 45.  However, these responses reveal that Socata does not makes sales through its website.  Id.  On this record, the existence of the website does not help the plaintiffs to establish jurisdiction.  See discussion infra, p. 24.

Cir. 2010); <u>Nowak v. Tak How Inv., Ltd.</u>, 94 F.3d 708, 712 (1st Cir. 1996); <u>World Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 291 (1980); <u>Caplan v. Donovan</u>, 450 Mass. 463, 879 N.E.2d 117, 120 (2008).

Because the Massachusetts Supreme Judicial Court has interpreted the state's long-arm statute to extend to the limits permitted by the United States Constitution, the court "'may sidestep the statutory inquiry and proceed directly to the constitutional analysis.'" <u>Evans Cabinet Corp.</u>, 593 F.3d at 146 (quoting <u>Daynard</u>, 290 F.3d at 52) (internal quotation marks omitted)); <u>see also</u> <u>Cossaboon v. Maine Medical Center</u>, 2010 WL 1078342, *11 n.1 (C.A.1 (N.H.) March 25, 2010); <u>Fiske v. Sandvik Mining and Const. USA, LLC</u>, 2009 WL 3163329, *5 (D. Mass. Sept. 25, 2009). Accordingly, the court is determining whether personal jurisdiction exists over these defendants by applying the standards of the Due Process Clause.

A.  <u>Constitutional Requirements</u>

1.  <u>Underlying Principles</u>

The central inquiry of the constitutional personal jurisdiction analysis is whether the non-resident defendant possesses the necessary "minimum contacts" with the forum state so that subjecting it to that forum's jurisdiction will not offend the "'traditional notions of fair play and substantial justice.'" <u>United Electrical Workers v. 163 Pleasant Street Corp.</u>, 960 F.2d 1080, 1087 (1st Cir. 1992) ("<u>Pleasant Street I</u>") (quoting

<u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)). This focus is necessary to assure that jurisdiction is only exercised where "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).  The two recognized types of personal jurisdiction are "general" and "specific" jurisdiction:

> General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state . . . Specific jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.

<u>Pleasant Street I</u>, 960 F.2d at 1088-89.

Plaintiffs contend that the court may exercise either specific or general jurisdiction over the SimCom defendants, but only general jurisdiction over Socata.  Thus, the court is addressing both types of jurisdiction with regard to the SimCom defendants, but only general jurisdiction with regard to Socata.  Because the specific jurisdiction argument with regard to Socata is not plead, it has been waived.  <u>See</u> <u>Pacamor Bearings, Inc. v. Minebea Co., Ltd.</u>, 892 F. Supp. 347, 355 n. 8 (D.N.H. 1995) ("[B]ecause this argument was not properly raised and briefed...the court will not consider it here."); <u>Malone v. Signal Processing Technologies, Inc.</u>, 826 F. Supp. 370, 378 (D. Col. 1993) ("Because this argument was not raised in [defendant's] initial brief, I decline to consider it.").

-12-

In the present case, the plaintiffs have not established either general or specific jurisdiction over the SimCom defendants, or general jurisdiction over Socata.   Accordingly, the court's exercise of personal jurisdiction over these defendants in this case would violate the Due Process Clause.

2.   <u>Specific Jurisdiction</u>

The First Circuit has established a tripartite test for determining whether specific jurisdiction exists:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

<u>Nowak</u>, 94 F.3d at 712-13.   This test is not a "mechanical exercise," and "a failure to demonstrate the necessary minimum contacts eliminates the need even to reach the issue of reasonableness: '[t]he [g]estalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled.'"   <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1394 (1st Cir. 1995) (quoting <u>Pleasant Street I</u>, 960 F.2d at 1091 n. 11).   A court that analyzes specific personal jurisdiction should only consider contacts that occurred "before and surrounding the accrual of the cause of action," to ensure the "fair warning" required by the Due

-13-

Process Clause.  <u>Harlow</u>, 432 F.3d at 61.[15]

     a.  <u>Relatedness</u>

The First Circuit standard for determining whether a claim "arises out of" the defendant's activities within the state lies somewhere between a "but for" and a "proximate cause" test. <u>Nowak</u>, 94 F.3d at 713-16 (describing the First Circuit standard as "a small overlay of 'but for' on 'proximate cause'"). Plaintiffs allege that this standard is satisfied because the crash arose out of SimCom's exclusive training arrangement with Socata, which was reached in February, 1999, after Boston-based J.W. Childs had acquired SimCom. Plaintiffs argue that in light of the relationship between SimCom and J.W. Childs, the arrangement "would have been developed and approved, at least in part, in Boston by the officers located there." Plaintiffs' Response to SimCom at 10. They further argue that "[w]ithout this exclusive agreement, Milot would not have been obliged to attend the SimCom Socata training," and that "for aircraft insurance to be in effect, a member of the flight crew was required to obtain training through an authorized flight training academy."[16]  <u>Id.</u> at 10, 12. Plaintiffs also contend that the evidence that SimCom International, Inc. sends flight instructors to Massachusetts, sends unsolicited advertisements to potential Massachusetts customers, and obtains substantial revenue

---

[15]This is in contrast to the general personal jurisdiction analysis, under which all contacts up until the filing of the complaint can be considered.  <u>See Harlow</u>, 432 F.3d at 65.

[16] Plaintiffs do not support this assertion in their proffers.

from Massachusetts customers makes a <u>prima</u> <u>facie</u> showing of specific jurisdiction.

This evidence does not support a finding of specific jurisdiction. The facts that SimCom International, Inc. sends flight instructors and direct mailings to Massachusetts, and derives revenue from Massachusetts customers, do not bear on the specific jurisdictional inquiry, as the plaintiffs neither allege nor provide evidence to support a finding that the accident in question arose out of these contacts with Massachusetts. The connection between J.W. Childs and the SimCom defendants does not supply the missing necessary nexus.

In <u>Pleasant Street I</u>, the First Circuit found that a Massachusetts court could not exercise jurisdiction over a company headquartered and incorporated in Scotland. <u>Pleasant Street I</u>, 960 F.2d at 1083. It reached this conclusion despite the fact that one of the principals of the Scottish corporation had been involved in negotiating the collective bargaining agreement that was alleged to have been breached, and despite the fact that the Scottish corporation had appointed its subsidiary's directors, sent two of its salaried principals to serve as high-level executives of the Massachusetts subsidiary, and invested approximately $8,000,000 in the Massachusetts corporation. <u>Pleasant Street I</u>, 960 F.2d at 1083-84. The court reasoned that only the Scottish company's involvement in the negotiations over the collective bargaining agreement could have given rise to the cause of action, and that

this involvement was insufficient to establish the court's jurisdiction over the Scottish company in its own right. <u>Id.</u> at 1089-91. Jurisdiction could not be based on the actions of the Massachusetts subsidiary, the court held, because the limited liability principle prevented the attribution of the Massachusetts company's actions to the Scottish parent. <u>Id.</u> at 1091-97.

There are several material similarities between the facts of <u>Pleasant Street I</u> and those in the instant case. As in <u>Pleasant Street I</u>, there is only one contact between the out-of-state defendant and the forum state out of which the cause of action can be said to have arisen – the exclusivity contract between SimCom International, Inc., and Socata. Yet the connection between the exclusivity agreement and the crash is far more attenuated than the connection between the collective bargaining negotiations and the plaintiffs' cause of action in <u>Pleasant Street I</u>, where the plaintiffs alleged breach of the contract that had resulted from those negotiations. <u>Id.</u> at 1089.

Here, plaintiffs argue that the exclusivity agreement, which was allegedly reached with the involvement of Boston-based J.W. Childs, obliged decedent Milot to receive training on the accident aircraft from SimCom International, Inc. The terms of the agreement belie this contention.[17] The agreement states that SimCom International, Inc. will be the only flight trainer <u>promoted</u> by Socata. Plaintiffs' Response to SimCom, Ex. K. It does not

---

[17] <u>See</u> <u>supra</u>, n. 3.

require that all Socata pilots be trained by SimCom International, Inc., however.  Id.  The uncontested affidavit of SimCom International president Walter David confirms this conclusion. David states that the exclusivity of the agreement related only to the promotion of training services, and that there are "at least three other well-established TBM trainers in the United States." Second David Aff., ¶15; Ex. G.  David further notes that Peter John Karoly, the other pilot on board the accident aircraft at the time of the crash, did not receive flight training from SimCom International, Inc.  Id., ¶17.  Thus, the agreement does not support the plaintiffs' assertion that decedent Milot was required to receive flight training from SimCom International, Inc.

Also weakening the plaintiffs' argument concerning relatedness is the fact that Walter David's uncontested affidavit states that "no J.W. Childs firm or personnel was involved in any respect in soliciting, developing, negotiating, structuring, drafting or approving the Training Agreement, or any Amendments thereto, between SimCom International and ...Socata Aircraft."  Second David Aff., ¶9.  David further states that SimCom International, Inc., and Socata began "exploring a potential training provider relationship...long before any contact between SimCom International and [SimCom] or any representative of J.W. Childs with respect to a potential acquisition of SimCom International by [SimCom]." Second David Aff., ¶12.  This is in contrast to the negotiations at issue in Pleasant Street I, in which a principal of the parent

company was involved "[d]uring the period when purchase was under consideration." Pleasant Street I, 960 F.2d at 1083. The plaintiffs have not presented any evidence that calls David's statements into question.

There is a third factor that weighs against finding that the accident arose out of J.W. Childs' involvement in reaching the exclusivity agreement. In Pleasant Street I, the First Circuit held that the evidence did not justify piercing the corporate veil. Pleasant Street I, 960 F.2d at 1091. As subject matter jurisdiction was based on a federal question, the court applied a federal standard that it described as "sometimes...less rigorous than its state law counterparts." Id. at 1092.[18] It nevertheless found that the litigants had failed to show the "lack of corporate independence, fraudulent intent, and manifest injustice" necessary to justify piercing the corporate veil. Id. at 1093. The court emphasized that "corporations which simply try to limit their overall liability by establishing, or acquiring, separately incorporated subsidiaries do not thereby transgress legal or ethical norms," and reasoned that "a more free-wheeling approach to veil piercing would hamstring established businesses in their legitimate efforts to expand into new fields; undermine the predictability of corporate risk-taking; and provide a huge disincentive for the investment of venture capital." Id. It

---

[18]In contrast, the First Circuit noted that "[u]nder Massachusetts law, disregarding the corporate form is permissible only in rare situations." Id. at 1091.

concluded that "there is a glaring shortfall in the proof," as the district court had not found that the subsidiary was "a sham or inadequately capitalized," or that the parent company had used its independent relationship with its subsidiary to deceive or corruptly avoid its legal obligations.  Id. at 1094.

Evidence of such questionable behavior is also lacking in the instant case.  The plaintiffs do not argue that either J.W. Childs or the SimCom defendants acted with intent to defraud, and present no evidence or argument regarding the capitalization of the SimCom defendants.  Moreover, the applicable standard in the instant case is the more stringent Massachusetts standard, not the federal standard.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 15 (1st Cir. 1985) (describing the Massachusetts standard for veil piercing, and permitting it where the defendant had incorporated a new organization and transferred $100,000 to it the day after stopping payment on a check for $110,000 for goods already delivered).  The record before this court does not justify piercing the corporate veil to attribute the actions of the SimCom defendants to J.W. Childs.

Because the plaintiffs have failed to establish that the aircraft accident arose out of or was related to the SimCom defendants' Massachusetts activities, the inquiry into specific jurisdiction need go no further. For the foregoing reasons, plaintiffs have failed to make the prima facie showing necessary to

permit the exercise of specific personal jurisdiction over the SimCom defendants.

        3.  <u>General Jurisdiction</u>

The First Circuit interprets the Due Process Clause "to impose three requirements on the exercise of general jurisdiction over out-of-state defendants[:] (1) the defendant must have sufficient contacts with the forum state, (2) those contacts must be purposeful, and (3) the exercise of jurisdiction must be reasonable under the circumstances." <u>Cossaboon</u>, 2010 WL 1078342 at *4 (citations omitted). As explained earlier, in determining whether the exercise of general jurisdiction is proper, courts in the First Circuit "'consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit.'" <u>Id.</u> at *1 (quoting <u>Harlow</u>, 432 F.3d at 65.)

To satisfy the first prong of this test, a defendant must either be domiciled in the forum state or engage in activities there are "continuous and systematic." <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414-16 (1984); <u>see also</u> <u>Cossaboon</u>, 2010 WL 1078342 at *4. These contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities." <u>International Shoe</u>, 326 U.S. at 318. This standard is "considerably more stringent" than the minimum contacts standard required for the exercise of specific jurisdiction. <u>Glater</u>, 744 F.2d 213, 216 (1st Cir. 1984).

To satisfy the second requirement of this test, a defendant's contacts with the forum state must be "purposeful." Cossaboon, 2010 WL 1078342 at *4 (quoting Harlow, 432 F.3d at 57). This standard is only met "'when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." Id. (quoting United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 624 (1st Cir. 2001)). This analysis – which is often combined with the analysis under the "continuous and systematic" prong of the test – is necessarily qualitative, and is "'guided by the types of contacts deemed sufficiently continuous and systematic in other cases.'" Id. at *5 (quoting Noonan v. Winston Co., 135 F.3d 85, 93-94 (1st Cir. 1998)).

Like the reasonableness inquiry in the analysis of specific personal jurisdiction, the reasonableness third prong of the general personal jurisdiction analysis is "'secondary rather than primary; unless the defendant has some cognizable contacts with the proposed forum, the court cannot assert general jurisdiction.'" Id. (quoting Sandstrom v. Chem-Lawn Corp., 904 F.2d 83, 89 (1st Cir. 1990)). Thus, if the plaintiff fails to satisfy the first two prongs of the general jurisdiction test, the test is not met, and the court need not inquire into the reasonableness of the exercise of jurisdiction in that case. Id.

a.  SimCom Defendants

Plaintiffs argue that the SimCom defendants have purposefully conducted "continuous and systematic business dealings within the Commonwealth."  Plaintiffs' Response to SimCom at 4.  The evidence that plaintiffs provide to support this assertion is the relationship between J.W. Childs and the SimCom defendants; the fact that between July, 2000 and December, 2008, SimCom International, Inc. generated over $2.5 million from Massachusetts customers; the fact that the SimCom defendants have sent flight instructors and direct mailings to Massachusetts; and the fact that SimCom maintains a website.

These facts are insufficient to establish "continuous and systematic" or "purposeful" contacts with Massachusetts.  As discussed earlier, the principle of corporate separateness does not permit this court to attribute the actions of J.W. Childs to the SimCom defendants, where the plaintiffs have not justified a piercing of the corporate veil.  See Pleasant Street I, 960 F.2d at 1091.  The remaining contacts with Massachusetts fall short of the level of contacts that the First Circuit and the Supreme Court have held are necessary for the exercise of general personal jurisdiction over an out-of-state defendant.  See, e.g., Cossaboon, 2010 WL 1078342 at *10; Helicopteros, 466 U.S. at 414.

In Perkins v. Benquet Consol. Mining Co., in which the Supreme Court upheld the exercise of general personal jurisdiction over an

-22-

out-of-forum defendant, the Court held that a Philippine mining company that maintained its general business operations in Ohio had continuous and systematic contacts with that state. <u>Perkins v. Benguet Consol. Min. Co.</u>, 342 U.S. 437, 448 (1952). The chief officer of the corporation maintained an office in Ohio, company files were kept there, company finances were handled through in-state banks, correspondence originated there, and board meetings were held in the state. <u>Id.</u> at 447-48. In contrast, in <u>Helicopteros</u>, the Court held that a defendant that over a seven year period had purchased more than $4,000,000 of helicopters and equipment in-state, sent its Chief Executive Officer to negotiate a contract in-state, accepted checks drawn on in-state banks, and trained employees in the forum state could not be subjected to general jurisdiction. <u>See Helicopteros</u>, 466 U.S. at 414. The Court reasoned that a one-time business trip could not be the basis of general jurisdiction, that a payee usually has no influence regarding the bank from which checks to it are drawn, that the trainings were simply an aspect of the helicopter purchases, and that the purchases themselves, "even if occurring at regular intervals, were not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." <u>Id.</u> at 418.

The contacts of the SimCom defendants are far less than those of the defendants in either <u>Perkins</u> or <u>Helicopteros</u>. They are also less than the contacts of defendants over whom the First Circuit

-23-

has found the exercise of jurisdiction unwarranted.  The 1.36% of total revenue that the SimCom defendants derived from Massachusetts customers between 2000 and 2008, for example, is less than half of the percentage of total revenue derived from in-state residents (3.24%) that the First Circuit found insufficient to support a New Hampshire court's exercise of general jurisdiction over Maine Medical Center ("MMC") in Cossaboon.  Cossaboon, 2010 WL 1078342 at *3.  In that case, the First Circuit held the following contacts insufficient to establish general jurisdiction over the MMC: (1) the hospital advertised to New Hampshire residents; (2) the hospital operated an interactive website accessible in New Hampshire; (3) the hospital was registered to do business in New Hampshire and had one New Hampshire-based employee; (4) the hospital had an agreement with New Hampshire-based Dartmouth Medical School under which Dartmouth students would do rotations at the hospital; and (5) the hospital treated "a substantial number" of New Hampshire residents.  Id. at *5.

The SimCom defendants' contacts are both less "continuous and systematic" and less "purposeful."  Unlike the website in Cossaboon, which enabled users to make online donations, complete pre-registration, register for classes, and find a doctor, SimCom International, Inc.'s website is not interactive.  See SimCom Defendants' Reply, Ex. 10, ¶15; Ex. 11, ¶¶15, 24; see also McBee v. Delica Co., 417 F.3d 107, 124 (1st Cir. 2005) ("the mere existence of a website that is visible in a forum and that gives information

about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum. Something more is necessary, such as interactive features which allow the successful online ordering of the defendant's products.") (citations omitted).

Unlike the MMC, the SimCom defendants are not registered to do business in Massachusetts and have no Massachusetts-based employees.   First David Aff., ¶¶6, 10; Brannon Aff., ¶¶6, 10. Indeed, there is no evidence that its employees have had contact with Massachusetts beyond the seventeen instructor trips, to assist only six individual customers, over the course of eight years.   Nor do the SimCom defendants have any arrangement with an in-state institution approximating MMC's relationship with Dartmouth Medical School.   New Hampshire patients made up a larger percentage of MMC's total patient population (1.23%) and provided a larger percentage of total revenue (3.24%) than do the Massachusetts-based customers of SimCom (0.033% and 1.36%, respectively).   SimCom Interrogatories, ¶1.

Moreover, while SimCom International, Inc.'s direct mailings to Massachusetts residents and advertisements in nationwide trade publications are not clearly less "purposeful" or less "continuous and systematic" than MMC's issuance of periodic press releases to forty-five media outlets, including two in New Hampshire, and its placement of a job opening ad in a regional trade publication, neither are they clearly more so.   See Cossaboon, 2010 WL 1078342

at *6.   There is no evidence that the SimCom defendants'
advertisements or mailings targeted Massachusetts residents in
particular.  SimCom International, Inc., sends its direct mailings
to TBM 700 owners in whatever state and country in which they
reside.  SimCom Interrogatories, ¶3; cf. Turpin v. Mori Seiki Co.,
Ltd., 56 F. Supp. 2d 121 (D. Mass. 1999) (holding that to justify
a Massachusetts court's exercise of general jurisdiction, an out-
of-state corporation must do more than supply brochures for
distribution to the United States as a whole).  Moreover, as the
First Circuit noted in Cossaboon, it has previously found that even
extensive advertising contacts with the forum state are
insufficient to permit the exercise of general jurisdiction.   Id.
at *6 (citing Glater, 744 F.2d at 215).

     For the foregoing reasons, the plaintiffs have failed to
establish that the SimCom defendants' contacts with Massachusetts
are either "substantial and continuous" or "purposeful."  It is,
therefore, unnecessary to pursue the general jurisdiction inquiry
further.  Plaintiffs have not made a prima facie showing that
general jurisdiction exists over the SimCom defendants.

                    b. Socata North America, Inc.

     Plaintiffs contend that Socata's contacts with Massachusetts
– the three business trips to Massachusetts conducted by Socata
employees, the advertisements in national publications, and the
sales to Massachusetts customers generating approximately
$1,300,000, or roughly 0.2% of Socata's total sales during that

time period – demonstrate that Socata purposefully established continuous and systematic contacts with Massachusetts sufficient to justify the exercise of general jurisdiction over it.  This contention is, however, not correct because these contacts were neither continuous and systematic nor purposeful.  Because Socata's contacts with Massachusetts fail to satisfy the first two prongs of the general jurisdiction inquiry, it is unnecessary to consider the reasonableness prong.

In <u>Donatelli v. Nat'l Hockey League</u>, the First Circuit found no general personal jurisdiction over the National Hockey League (the "NHL"), despite the facts that for ten years the League had provided officials for exhibition hockey games in-state, conducted scouting in-state, broadcast games in-state, and sold NHL logo products in-state.  <u>Donatelli</u>, 708 F. Supp. 31, 35 (D.R.I. 1989), <u>rev'd</u> 893 F.2d 459 (1st Cir. 1990).  In <u>Glater</u>, the First Circuit found that a manufacturer who employed eight in-forum advertising representatives and sold products to in-state distributors did not have the "continuous and systematic" contacts with the forum state to justify the exercise of general jurisdiction. <u>Glater</u>, 744 F.2d at 216-17.  Similarly, in <u>Noonan</u>, the First Circuit held that the foreign defendant's regular solicitation of business from an in-state book distributor – which involved telephone, fax, and written communications as well as two trips from England to Massachusetts, and which had generated $585,000 in a one-and-a-half year period –

-27-

did not justify the exercise of general jurisdiction over the out-of-forum defendant.  Noonan, 135 F.3d at 92-93.

Here, Socata's advertising efforts and business trips were no more continuous and systematic or purposeful than those deemed insufficient in Donatelli, Glater, and Noonan.  Socata representatives' three business trips to Massachusetts are far less than the presence of NHL "officials [at] one or two exhibition hockey games" a year in Donatelli, 708 F. Supp. at 35, or the eight in-forum sales representatives in Glater.  Socata's non-targeted advertising in national trade publications and online is less systematic and purposeful than the active solicitation of business through multiple media, as well as two trans-Atlantic visits in less than two years, that was present in Noonan.  In light of these decisions, Socata's business trips and nationwide marketing campaigns are neither continuous and systematic nor purposeful.

Whether Socata's sales activity constitutes a basis for general jurisdiction is a closer question.  The record does reflect Socata's involvement in hundreds of transactions with Massachusetts-based customers between 1998 and 2008, pursuant to which Socata shipping its products into Massachusetts, generating $1,300,000 in sales.  Such contacts are more substantial than Socata's other contacts with Massachusetts and have been scrutinized by the court.

A comparison between the record in this case and the facts in Helicopteros is instructive.  In Helicopteros, the Supreme Court

-28-

found no general jurisdiction over a Columbian corporation in the business of providing helicopter transportation, which had purchased approximately 80% of its fleet from companies in Texas over a seven year period, and spent more than $4,000,000 in the state.  See Helicopteros, 466 U.S. at 411.  The company also regularly sent its pilots to Texas for training and to ferry the purchased aircraft to South America.  Id.  Nevertheless, the Supreme Court held that an exercise of general jurisdiction over the petitioner was not justified.  Id. at 414.

The sales contacts between Socata and Massachusetts residents are of lesser magnitude than the contacts at issue in Helicopteros. The scattered sales record in the instant case does not reveal any sizable or regular business relationships with Massachusetts customers.  In Helicopteros, the Court found significant the fact that the petitioner did not have any offices, employees, or property in Texas.  Id. at 411.  Socata has no offices, employees, or property in Massachusetts.  Chabbert Decl., ¶3.  Given the lack of such telltale ties to Massachusetts, as well as the absence of any advertising or direct mail campaigns targeting Massachusetts, Socata must be found to have had only casual contacts with Massachusetts customers, driven by the purchasers' initiative. This is not enough to subject Socata to the "obligations" that may arise from enjoying "the benefits and protection of the laws" of Massachusetts.  International Shoe Co., 326 U.S. at 319.  In light of the Supreme Court's holding that the far more systematic,

continuous and purposeful forum contacts in <u>Helicopteros</u> did not justify an exercise of general jurisdiction over a defendant, the court concludes that Socata's contacts with Massachusetts were insufficient to permit the exercise of general jurisdiction over it in the instant case.

4. <u>Additional Jurisdictional Discovery</u>

The plaintiffs request permission to conduct additional jurisdictional discovery should this court seek additional evidence upon which to determine if a <u>prima facie</u> showing has been made with regard to both the SimCom defendants and Socata. Such additional discovery is not warranted. The First Circuit has explained that while "a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery[,]...that entitlement is not absolute." <u>Swiss Amer.</u> <u>Bank, Ltd.</u>, 274 F.3d at 625. In <u>Swiss American</u>, the First Circuit found that the plaintiff had not made an adequate showing on the relatedness prong of the specific jurisdiction inquiry and, therefore, had not clearly presented a colorable claim for personal jurisdiction sufficient to warrant additional discovery. <u>Id.</u> at 626. Similarly, the plaintiffs in the instant case have failed to present a colorable claim regarding the court's jurisdiction over either the SimCom defendants or Socata. Thus, the plaintiffs' request for leave to conduct additional discovery is being denied.

IV.   ORDER

For the foregoing reasons, it is hereby ORDERED that:

1.   The Motion to Dismiss of Defendants SimCom International, Inc., and  SimCom, Inc. (Docket No. 7) is ALLOWED.

2.   Defendant Socata North America, Inc.'s Motion to Dismiss For Lack of Personal Jurisdiction (Docket No. 51-1) is ALLOWED.

3.   The plaintiffs' requests for leave to conduct additional jurisdictional discovery regarding the SimCom defendants and Socata are DENIED.

_____/s/ Mark L. Wolf_____
UNITED STATES DISTRICT JUDGE