# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| HARRY NEWMAN, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 09-10138-DJC |
| | ) |
| EUROPEAN AERONAUTIC DEFENCE AND | ) |
| SPACE COMPANY EADS N.V., et al., | ) |
| | ) |
| Defendants. | ) |
_____)

## MEMORANDUM AND ORDER

Casper, J.                                                                                         June 16, 2011

## I.        Introduction

This case arises out of a February 2, 2007 crash of a Socata TBM 700 aircraft near the New Bedford Regional Airport in Massachusetts in which all of the aircraft's occupants, Michael J. Milot, Lauren Angstadt and Peter John Karoly, died. Plaintiffs Harry Newman, Thomas A. Wallitsch and Patricia and John Milot ("Plaintiffs"), administrators *pendente lite* of the estates of the three decedents brought this action for breach of warranty, negligence, strict liability and punitive damages against numerous defendants, including Defendant Socata SAS ("Socata"), the manufacturer of the aircraft. Socata has now moved to dismiss the complaint for lack of personal jurisdiction. For the reasons set forth below, Socata's motion to dismiss for lack of personal jurisdiction is GRANTED.

## II.       Burden of Proof and Standard of Review

Although it is Socata's motion to dismiss, the Plaintiffs ultimately bear the burden of establishing that personal jurisdiction over Socata exists. Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). Here, the parties agree that the prima facie standard governs the Court's determination of whether it has personal jurisdiction. (Pl. Opp. at 3; Def. Reply at 2).[1] Thus, to meet its burden, the plaintiff must "demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001) (internal quotations and citation omitted). Under this standard, the court will look to the facts alleged in the pleadings and the parties' supplemental filings, including affidavits. Sawtelle v. Farrell, 70 F.3d 1381, 1385 (1st Cir. 1995); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994). The court will "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of Law, 142 F.3d at 34. It will then "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." Id. Notwithstanding the liberality of this approach, the court will not "credit conclusory allegations or draw farfetched inferences." Ticketmaster-New York, Inc., 26 F.3d at 203.

---

[1] For the purposes of this Memorandum and Order, all references to the parties' filings are abbreviated as follows: Defendant's memorandum in support of its motion to dismiss ("Def. Memo"); Declaration of Elisabeth Cassagnes attached to the Defendant's memorandum in support of its motion to dismiss and attached to Plaintiff's opposition as exhibit 3 ("Cassagnes Decl."); Transcript of the deposition of Nelson Chabbert attached to Plaintiffs' opposition to defendant's motion to dismiss as exhibit 1 ("Chabbert Dep."); Plaintiffs' renewed opposition to Defendant's motion to dismiss ("Pl. Opp."); Defendant's reply to Plaintiffs' opposition to motion to dismiss ("Def. Reply") and transcript of oral argument from May 11, 2011 hearing ("Tr.").

### III. Factual Background

Plaintiffs, who are citizens and residents of Pennsylvania, have sued numerous defendants, including Socata. Socata is a company organized under French law with a principal place of business in Tarbes, France. (Cassagnes Decl. ¶ 2). Socata designed and manufactured the TBM-700 aircraft involved in the crash. (Cassagnes Decl. ¶ 4). The Socata TBM-700 is an aviation aircraft that seats six people: a pilot, a co-pilot and four passengers. (Pl. Opp. ¶ 4; Chabbert Dep. at 22-23). The aircraft is purchased primarily by individuals or companies for private, non-commercial use. (Pl. Opp. ¶ 4; Chabbert Dep. at 23-24). Socata does not conduct business in Massachusetts, has no registered agent in Massachusetts, has no registered agent for service in Massachusetts, does not maintain any offices in Massachusetts, has no employees based in Massachusetts, holds no bank accounts in Massachusetts, has no telephone listings in Massachusetts, has never paid taxes to the State of Massachusetts and does not own any personal or real property in Massachusetts. (Cassagnes Decl. ¶ 3).

Socata did not sell the TBM-700 aircraft involved in the crash in Massachusetts nor were any of the entities involved in the transactions that led to its sale to PK Leasing, the Pennsylvania owner at the time of the crash, based in Massachusetts. In 2001, a company called Columbia Aircraft Sales, Inc. ("Columbia"), based in Groton, Connecticut, purchased the aircraft in France from Socata (Id.) and Socata delivered it to Columbia at Socata's place of business in France. (Pl. Opp. ¶ 23; see also Cassagnes Decl. ¶ 4; Ex. A (Terms & Conditions for sale of aircraft) and Ex. B (Certificate of Acceptance)). Columbia then sold the aircraft to Chesapeake Leasing, Inc. located in Virginia, which then sold it to PK Leasing. (Pl. Opp. ¶ 23).

Socata was not a party to any distribution agreement to sell the TCM-700 aircraft in the

United States.  (Pl. Opp. at 19, Ex. 6 (Columbia Distribution Agreement); Def. Reply at 11).

However, Socata North America, which is located in Florida and has been previously dismissed

from this action, has distribution agreements with several regional United States distributors of the

Socata TBM series aircraft.  (Pl. Opp. ¶ 2).  The relationship between Socata and Socata North

America at the time of the 2007 accident was as follows:  EADS Socata North America was owned

by EADS North America while EADS Socata S.A. (the predecessor of Socata) was owned by EADS

France.  (Pl. Opp. ¶ 3).  EADS Socata S.A. and EADS North America were then independent

entities owned by two different entities which were in turn both owned by EADS, N.V.  (Pl. Opp.

¶ 3).  Socata had no ownership interest in Socata North America at the time.  (Pl. Opp. ¶ 3;

Cassagnes Decl. ¶ 5).[2]  The 2000 distribution agreement between EADS Socata North America,

now known as Socata North America, and Columbia Aircraft provided that "Socata [North America]

sells its Products at its sole discretion either by direct sales, or through the use of aircraft sales

representatives (ASRs), or through a network of distributors, of which Distributor wishes to belong;

provided, however, that Distributor's Territory . . . shall be exclusive . . . ." (Pl. Opp. ¶ 11; Chabbert

Dep. at 94; Ex. 6, Distribution Agreement at 1)).    Under the agreement, Columbia was obligated

to "use its best efforts to promote the sale of the Product within the Territory," by employing a sales

force and advertising the aircraft to potential customers.  (Pl. Opp. ¶ 11; Ex. 6, Distribution

Agreement at 15).  The "Territory" includes sixteen states in the United States including

Massachusetts. (Ex. 6, Distribution Agreement at Ex. C). Although a distribution agreement existed

---

[2] In January 2009, approximately two years after the accident and about one month
before this lawsuit was filed, EADS Socata became Socata.  (Pl. Opp. ¶ 1).   At that time, EADS
North America, Inc., also became Socata North America.  (Pl. Opp. ¶ 2).   Socata then became
the 100% owner of Socata North America, which is a New York corporation with its principal
place of business in Florida.  (Pl. Opp. ¶ 3; Cassagnes Decl. ¶ 5).

between EADS Socata North America and Columbia at the time of the accident, no distribution agreement existed between EADS Socata S.A. (Socata's predecessor) and Columbia.

## IV.    Procedural History

Plaintiffs initiated this lawsuit on January 29, 2009, asserting claims for strict liability (Count I), negligence (Counts II, VI - XI), and breach of warranty (Count III), and punitive damages (Count IV) and breach of contract (Count V), against numerous defendants.  Plaintiffs assert the claims in Counts I through IV and VI against Socata.  Since the filing of Plaintiffs' first amended complaint on March 4, 2009 (Docket # 4) and their second amended complaint on March 16, 2010 (#128), numerous defendants have been dismissed.[3]

On June 29, 2010, Defendant Socata moved to dismiss for lack of personal jurisdiction (#158).  The parties then agreed to engage in jurisdictional discovery prior to the Court's ruling on Socata's motion to dismiss. (#182).  However, because the time for filing dispositive motions had passed, both under the Federal Rules of Civil procedure and according to the Court's scheduling order, on December 21, 2010, Socata was ordered by the Court (Wolf, J.) to show cause why its motion should not be denied as untimely. (#185).  On January 14, 2011, Socata responded that the parties had agreed among themselves that the motion could be filed late but had neglected to seek permission from the court.  (#188).  After the Court found that Socata had shown good cause and ruled that its motion to dismiss for lack of personal jurisdiction would not be denied as untimely

---

[3]The following Defendants have been dismissed from this action for lack of personal jurisdiction:  EADS North America, Inc. (dismissed on March 3, 2010) (#124); SimCom International, Inc., SimCom, Inc. and Socata North America, Inc. (all dismissed on March 30, 2010) (#131); and EADS N.V., Compagnie Daher S.A., and Compagnie Daher S.A. (dismissed on December 21, 2010) (#185).  On March 31, 2011, the following Defendants were dismissed by reason of settlement with the Plaintiffs:  the City of New Bedford, Airport Solutions Group, LLC and Vanasse Hangen Brustlin, Inc. (#204).

(#191), the parties requested additional briefing on the motion to dismiss (#195) now before the Court. This matter was transferred to this session (Casper, J.) on January 21, 2011 and the Court heard oral argument on May 11, 2011. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## V.     Discussion

### A.     Overview of Personal Jurisdiction

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002) (internal quotations and citations omitted). Accordingly, this Court may only exercise personal jurisdiction within the limits set by Massachusetts' long-arm statute and the Constitution. Lyle Richards Intl, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112 (1st Cir. 1997). Here, the Court "may sidestep the statutory inquiry and proceed directly to the constitutional analysis. . .because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute 'as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.'" Daynard, 290 F.3d at 52 (quoting "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 443 (1972)). "Constitutional limitations on the exercise of personal jurisdiction over out-of-state defendants are rooted in principles of fundamental fairness." Cossaboon v. Me. Med. Ctr., 600 F.3d 25, 32 (1st Cir. 2010) (quotations and citation omitted).

Due process requires that a non-resident defendant "ha[s] certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945) (quoting Milliken v. Meyer, 311

U.S. 457, 463 (1940)).  This constitutional guarantee of due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72 (1985) (quoting Int'l Shoe Co., 326 U.S. at 319).

Although a court may exercise two types of personal jurisdiction:  general and  specific, Cossaboon, 600 F.3d at 31,  the Plaintiffs do not contend that the Court has general jurisdiction over Socata and, therefore, the Court need only address whether Plaintiffs have  asserted sufficient facts to support the exercise of specific jurisdiction over Socata.

**B.    Specific Jurisdiction Analysis**

"The First Circuit employs a tripartite analysis to determine whether specific jurisdiction is appropriate:  1) whether the claims arise out of or are related to the defendant's in-state activities, 2) whether the defendant has purposefully availed itself of the laws of the forum state and 3) whether the exercise of jurisdiction is reasonable under the circumstances."  Pesmel N. Am., LLC v. Caraustar Indus., Inc., 754 F. Supp. 2d 168, 172 (D. Mass. 2010).

The first prong, relatedness, focuses on whether "'the claim underlying the litigation . . . directly arise[s] out of, or relate[s] to, the defendant's forum-state activities.'"  Astro–Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 9 (1st Cir. 2009) (quoting N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005)) (further citation omitted).  It is a "flexible, relaxed standard."  Id. (internal quotations and citations omitted).

To satisfy the second prong of purposeful availment, there must be some act or series of acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357

U.S. 235, 253 (1958). The purposeful availment test involves a consideration of both voluntariness and foreseeability. Voluntariness exists when a defendant deliberately has engaged in significant activities within the forum, but not when the defendant's contacts with the forum are "random, fortuitous, or attenuated" or result solely from "the unilateral activity of another party or a third person." Burger King Corp., 471 U.S. at 475 (internal quotations and citations omitted). Foreseeability exists when the defendant's conduct and connection with the forum state is such that the defendant "should reasonably anticipate being haled into court there." Id. at 474 (internal quotation and citation omitted).

If the first two parts of the test for specific jurisdiction are satisfied, the Court must still determine whether the exercise of personal jurisdiction is reasonable in light of the so called "Gestalt factors," including: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. Cossaboon, 600 F.3d at 33 n. 3. Even when the lawsuit arises out of the defendant's purposefully generated contacts with the forum, therefore, the court may decline to exercise personal jurisdiction if doing so would be unreasonable and fundamentally unfair. See Burger King, 471 U.S. at 476-78; Ticketmaster-New York, Inc., 26 F.3d at 209-10.

In regard to at least the purposeful availment prong discussed above, Plaintiffs argue that the Court has specific jurisdiction over Socata because its contact with the forum state satisfies the "stream of commerce plus" test - a derivation of the original "stream of commerce" theory. The stream of commerce theory arises from World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286

(1980) in which the Supreme Court held that the exercise of specific jurisdiction over a foreign manufacturer was permissible when the sale of its product is "not simply an isolated occurrence, but arises from [its] efforts . . . to serve directly or indirectly, the market for its product in other States . . ." and "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." Id. at 297-98. However, the Supreme Court subsequently ruled that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 112 (1987). Instead, Plaintiffs must put forth some evidence of "additional conduct of the defendant . . . indicat[ing] an intent or purpose to serve the market in the forum State...." Id. Asahi gave rise to the "stream of commerce plus" standard, later adopted by the First Circuit Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 683 (1st Cir. 1992) and which Plaintiffs agree has replaced "stream of commerce" as the appropriate standard.[4]

Although Plaintiffs argue that the "stream of commerce plus" standard means that the Court does not have to address the relatedness factor to find that there is specific jurisdiction over Socata (Pl. Opp. at 24-25), the Supreme Court and First Circuit have not made clear that this is the case. The Supreme Court did not specifically address the relatedness requirement in World-Wide

---

[4]Even prior to the Supreme Court's decision in Asahi and the First Circuit's adoption of the stream of commerce plus standard in Boit, in Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9, 15 (1st Cir. 1986), the First Circuit held that "[a]ssuming that [Defendant] knew that the destination of the helicopters was Puerto Rico, we do not think that the sale ... can be the source of a stream of commerce.... The test is not knowledge of the ultimate destination of the product, but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there").

<u>Wolkswagon</u> or <u>Asahi</u> nor has the First Circuit directly addressed this issue.[5]  Accordingly, it cannot be said that a court need no longer address relatedness- an inquiry that has always been a part of the jurisdictional test - simply because neither the Supreme Court nor the First Circuit have explicitly stated that relatedness must be discussed even where a plaintiff employs the stream of commerce plus theory.  Indeed, courts in this Circuit squarely address the relatedness requirement in addition to and independent from its purposeful availment analysis under which the stream of commerce plus theory is discussed.   <u>See, e.g.</u>, <u>JKA, Inc. v. Anisa Int'l Inc.</u>, No. 07-123S, 2008 WL 4949126, at *8 (D.R.I. Nov. 13, 2008) (discussing the stream of commerce plus theory in the context of its purposeful availment analysis while subsequently and separately addressing relatedness;) <u>Tower Mfg. Corp. v. Shanghai Ele Mfg. Corp.</u>, 533 F. Supp. 2d 255, 268-69 (D.R.I. 2008) (same); <u>In re Lupron Mktg. and Sales Practices Litig.</u>, 245 F. Supp. 2d 280, 297-98 (D. Mass. 2003) (finding that under the stream of commerce plus theory, the defendant's contact with the state were sufficient to show purposeful availment only); <u>Ranahan v. Pheasant Wilsons, Inc.</u>, No. 95-5-SD, 1995 WL 502412, at *3-8 (D.N.H. May 2, 1995) (addressing the stream of commerce plus theory in purposeful availment analysis while separately addressing relatedness).   <u>But see</u> <u>Unicomp, Inc. v. Harcros Pigments, Inc.</u>, 994 F. Supp. 24, 25-26 (D. Maine 1998) (noting that "[t]he Court determines that an alleged injury from the sale of a product in a forum targeted by the manufacturer through its choice of distributors is sufficiently foreseeable to satisfy the relatedness prong of the jurisdictional

---

[5]Plaintiffs' reliance on <u>Nowak v. Tak How Inv., Ltd.</u>, 94 F.3d 708, 713 (1st Cir. 1996) for this point (Pl. Opp. at 11) is misplaced since that case does not address the stream of commerce theory although it discusses relatedness.

inquiry").[6]  Accordingly, the Court addresses each of the three  prongs–relatedness, purposeful availment and reasonableness–in turn.

### 1.    Relatedness

The First Circuit has explained that "relatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases . . . [and] it ensures that the element of causation remains in the forefront of the due process investigation." Nowak, 94 F.3d at 714 (quoting Ticketmaster, 26 F.3d at 206) (internal quotation marks omitted). The First Circuit standard for determining whether a claim "arises out of" the defendant's activities within the state lies somewhere between a "but for" and a "proximate cause" test. Nowak, 94 F.3d at 713-16 (describing the First Circuit standard as "a small overlay of 'but for' on 'proximate cause'").

As discussed *infra*, the only connection between Socata and this lawsuit in Massachusetts is that one of Socata's aircrafts manufactured in France crashed in Massachusetts.  Socata has no employees, agents, offices, operations or property in Massachusetts, nor has it registered to conduct business in Massachusetts. Nor was Socata involved with any transactions regarding the airplane after selling it in France to Connecticut-based Columbia, including any of the transactions that caused it to be operated in Massachusetts.[7]  Thus, it cannot be said that Plaintiffs' claims arise out

---

[6]To the extent that Unicomp  suggests that a court need not consider the relatedness prong here, 994 F. Supp. at 26, the Court rejects that position for the reasons stated above. Moreover, as discussed *infra,* plaintiffs have not satisfied the purposeful availment requirement and, therefore, have failed to satisfy their burden of showing personal jurisdiction over Socata even if this Court were to accept fully the Plaintiffs' view of the appropriate standard.

[7]At oral argument, Plaintiffs' counsel represented that the sale of the plane involved in the crash was sold pursuant to the distribution agreement which allowed a U.S. customer, Columbia, to bypass the distribution system and purchase directly from Socata SAS in France. Even assuming this were the case, the accident still occurred in Massachusetts and Columbia, although an independent Socata dealer with Massachusetts, never sold the plane to anyone in

of or relate to Socata's activities in Massachusetts where none exist.

## 2. Purposeful Availment

The purposeful availment inquiry "focuses on the defendant's intentionality," and "is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." Swiss Am. Bank, Ltd., 274 F.3d at 623-24 (citations omitted). The Court focuses "on whether a defendant has 'engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just or reasonable.'" Sawtelle, 70 F.3d at 1391 (quoting Ruch v. Savchuk, 444 U.S. 320, 329 (1980)). "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous contacts' with the forum state." Sawtelle, 70 F.3d at 1391 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).

Here, Plaintiffs have not established that Socata has purposefully availed itself of Massachusetts. Socata had no distributor specifically in Massachusetts, did not sell or cause anyone else to sell its aircraft in Massachusetts, and did not make service visits to Massachusetts to work on the accident airplane, or any other airplane. Moreover, Socata did not sell the aircraft in the United States or in Massachusetts specifically. (Cassagnes Decl. ¶ 4). It does not conduct business in Massachusetts, has no registered agent in Massachusetts, has no registered agent for service in Massachusetts, does not maintain any offices in Massachusetts, has no employees based in Massachusetts, holds no bank accounts in Massachusetts, has no telephone listings in Massachusetts, has never paid taxes to the State of Massachusetts, and does not own any personal or real property

Massachusetts. As discussed *infra*, Socata did nothing in or directed at Massachusetts in particular.

in Massachusetts. (Cassagnes Decl. ¶ 3). Thus, Socata has not voluntarily engaged in activities in this forum. Nor was Socata involved with any transactions regarding the airplane after selling it in France to Connecticut-based Columbia, including any of the transactions that caused it to be operated in Massachusetts. Socata had no contact with Massachusetts other than the fact that the aircraft it manufactured crashed there. Thus, it cannot be said that Socata has purposefully availed itself of Massachusetts where it has had no contact with the state aside from the crash itself. See, e.g., Boit, 967 F.2d at 683 (finding no purposeful availment when the only contact with forum state was that plaintiff was injured by product manufactured by defendant in that state); Amburgey v. Atomic Ski USA, Inc., No. 2:06-149, 2007 WL 1464380, at *7-8 (D. Me. May 17, 2007) (same); Snell v. Bob Fisher Enter., Inc., 115 F. Supp. 2d 17, 22-23 (D. Me. 2000) (same).

Plaintiffs' argument that Socata purposefully availed itself of Massachusetts through its knowing utilization of a distribution network is not persuasive since Socata itself did not establish that distribution network, did not control it, and was not a party to the distribution agreement. At oral argument, counsel argued that Socata is playing a "corporate shell game" (Tr. 17-18) and hiding behind the distribution system owned by its "sister corporations." (Tr. 23). This argument is of no aid to the Plaintiffs. The record is devoid of any evidence that Socata North America was acting for Socata at the time of the accident. Socata North America was a separate and independent company from Socata. They were not one in the same and cannot be held to therefore be acting together for jurisdictional purposes. Plaintiffs' counsel also pointed to the sales development plan to suggest a sufficiently close relationship between the two entities (Ex. 4), but the plan shows nothing more than Socata's awareness of the distribution network established by Socata North America in the United States. Moreover, awareness and knowledge that products may end up in a forum state or in the

United States generally whether or not through a distribution network is insufficient to constitute purposeful availment.

### a. Stream of Commerce Plus

Relying upon the "stream of commerce plus standard," Plaintiffs assert that Socata (known as EADS Socata S.A. in 2007) has purposefully availed itself of the privilege of conducting business in Massachusetts through a targeted distribution system through which its aircraft is sold in the United States, including Massachusetts. (Pl. Opp. at 17). To support their argument, Plaintiffs almost solely rely on a distribution agreement, discussed *supra*, to which Socata was not even a party. The distribution agreement existed between Columbia and Socata N.A. (known as EADS Socata North America in 2007). Socata N.A. maintained a distribution agreement with Columbia that gave it the exclusive right to market, sell, and distribute Socata TBM aircraft in Massachusetts and fifteen other States and obligated Columbia to use its best efforts to promote the marketing and sale of the TBM aircraft in Massachusetts. (Pl. Opp. at 17; Ex. 6, Distribution Agreement at 1, 15; Chabbert Dep. at 72, 75, 93-94).

Under the distribution agreement, Columbia and other distributors of the Socata TBM aircraft, placed orders with Socata North America for new aircrafts to be purchased by U.S. citizens. In turn, Socata North America placed the order with Socata for the manufacture of the aircraft. (Pl. Opp. at 18; Chabbert Dep. at 108-109). The distribution agreement also permitted Columbia to bypass Socata North America and to purchase a new aircraft ordered by a U.S. customer directly from Socata and to distribute that aircraft directly to the customer. (Pl. Opp. at 18; Chabbert Dep. at 118-120); Ex. 6, Distribution Agreement at § 3.3(a)). With respect to the aircraft involved in the accident in February 2007, Columbia purchased the aircraft directly from Socata. (Pl. Opp. at

18,Chabbert Dep. at 110-12, 121-22; Cassagnes Decl. ¶ 4).[8]  When Columbia purchased the aircraft directly from Socata in 2001, Columbia then sold it to Chesapeake Leasing located in Virginia. (Cassagnes Decl. ¶ 4; Chabbert Dep. at 121-22).  In 2006, the aircraft was sold to PK leasing with Columbia acting as broker for the sale.  (Pl. Opp. at 19; Exs. 14, 17 & 18).  Beyond mere awareness of the distribution network, Plaintiffs have not presented any evidence of additional conduct on the part of Socata to show that it purposefully availed itself of Massachusetts.

Plaintiffs' argument fails to appreciate the *plus* in the "stream of commerce plus" standard. The First Circuit requires additional conduct beyond mere awareness of a distribution network to establish purposeful availment under the stream of commerce plus theory.  In Boit, the defendant manufacturer from Indiana, Gar-Tec, sold a product to a national distributor, Brookstone, which then sold it through the mail to the plaintiff's contractor in Maine.  967 F.2d at 673-74.  The Court found no evidence that "Gar-Tec designed the product for Maine, advertised in Maine, established channels for providing regular advice to customers in Maine, or marketed the product through a distributor who had agreed to serve as a sales agent in Maine."  Id. at 683 (citing Asahi, 480 U.S. at 112).  Because no evidence showed Gar-Tec "intended to serve the market in Maine," the Court found that Gar-Tec's "mere awareness" that the product "may end up in the forum state d[id] not constitute 'purposeful availment.'"  Boit, 967 F.2d at 683.[9]  Amburgey, upon which Socata relies,

---

[8]Plaintiffs also note that between 2003 and 2009, Columbia has sold at least five Socata TBM series aircraft to Massachusetts residents through the distribution channel utilized by Socata (Ex. 8, FAA Bills of sale), that there are currently 11 Socata TBM series aircraft registered to Massachusetts residents (Ex. 10, FAA Registry), and that Socata sold a TBM 700 aircraft directly to a corporation located in Massachusetts (Ex. 11, Bill of sale).   (Pl. Opp. at 18).

[9]Plaintiffs' attempt to distinguish Boit from the instant case is unavailing since both cases involve a middleman distributor that were neither established nor controlled by the manufacturer.  Id.

is particularly instructive on this point. 2007 WL 1464380. There, the plaintiffs failed to show any additional conduct by Atomic Austria demonstrating their intent or purpose to serve the market in Maine. Id. at *3. Atomic Austria manufactured allegedly defective ski bindings in Austria that caused an injury in Maine. Id. at *2. Just like Plaintiffs in this case, the plaintiffs in Amburgey argued that Atomic Austria purposefully availed itself of Maine through a distribution network that included Maine. Id. at *3. The Court declined to exercise personal jurisdiction under the stream of commerce plus standard and found that Atomic Austria did not establish or control the distribution network that brought its products to Maine nor was Atomic Austria involved with the distribution network beyond Atomic Ski USA, located in New Hampshire which distribute its products to independent distributors throughout the U.S., including dealers in Maine. Id. at *2-3; see Snell, 115 F. Supp. 2d at 22-23.[10]

Plaintiffs' argument that Socata need not be a party to the distribution agreement on which Plaintiffs heavily rely because Socata and Socata North America were "affiliated sister corporations owned by the same EADS holding company, EADS N.V." (Pl. Opp. at 17) at the time of the accident in 2007 is without merit. Plaintiffs claim that Socata has known since 2007 of the distribution system that would lead its products to states including Massachusetts because its "affiliated sister corporation" engaged Columbia, the distributor for the U.S. market. (Pl. Opp. at

---

[10]Plaintiffs rely on Unicomp, 994 F. Supp. 24, to support their argument that specific jurisdiction under the stream of commerce plus theory over Socata is proper. However, as the court in Amburgey explained, the court in Unicomp found that "the manufacturer itself established a distribution network that was known to serve Maine." Amburgey, 2007 WL 1464380, at *3; see also Unicomp, 994 F. Supp. at 26-28. Here, like Atomic Austria in Amburgey, Socata may have been aware of a distribution network that included Massachusetts when it sold the aircraft involved in the 2007 accident to Columbia, but unlike Harcros in Unicomp, Socata did not itself create or control the distribution network.

20).[11]  First, the fact that the distribution agreement existed between Columbia and EADS Socata North America, not Socata is significant because it means that Socata did not have control over the distribution channels to target certain states, including Massachusetts for the sale of its product. Thus, Socata is unlike the defendant in Unicomp who entered into an agreement with a distribution company whose target area included Maine.  Second, the fact that the corporations were affiliated at the time of the accident in 2007 is of no moment since Socata and Socata North America were two independent and separate entities at that time and shared no parent company.  The two separate entities that owned Socata and Socata North America shared a parent; Socata and Socata North America did not.  Significantly, Plaintiffs do not allege nor does the evidence show that either entity exercised any control over the other, that Socata had even been involved with establishing any of the distributorships established by Socata North America in the U.S. or that Socata had any control over the distributors of the Socata aircraft in the U.S., including Columbia.  In fact, Plaintiffs' evidence shows that "[t]he distribution network in the United States is not linked to Socata." (Chabbert Dep. at 45).[12]

In fact, the cases cited by Plaintiffs to support their argument that Socata purposefully availed itself of Massachusetts involves deliberate marketing and sales efforts targeted at the particular forum.  For example, in Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 29 (1st Cir. 1988), a Brazilian pressure cooker manufacturer was subject to jurisdiction in Puerto

---

[11]The fact that Socata became the 100% owner of Socata North America in January 2009 is irrelevant since conduct occurring after the accident on February 2, 2007 is not considered for jurisdictional purposes.  See Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005).

[12]The evidence shows that Socata has sold only one aircraft directly to buyers from Massachusetts which occurred in 1999.  (Pl. Opp. Ex. 11 (Bill of Sale "dated at TARBES, FRANCE")).

Rico where it "took active steps to sell its cookers in Puerto Rico."   For example, it "hired an 'export advisor' . . . to travel to Puerto Rico to discuss how [the defendant] could sell cookers in Puerto Rico." Id. This advisor, directly hired by the manufacturer, who was called the defendant's "sales representative," could solicit orders in Puerto Rico directly for the defendant. Id. While he lived in Florida, he traveled to Puerto Rico at least four times per year to sell the defendant's cookers and other products. Id. At oral argument, Plaintiffs' counsel argued that "awareness, knowledge and intention" satisfy the "plus" under the "stream of commerce plus" standard, relying on Benitez. (Tr. 10). However, unlike the manufacturer in Benitez who directed its sales efforts and its representatives to target Puerto Rico, Plaintiffs here do not allege nor does the evidence demonstrate any direct efforts on the part of Socata or that Socata hired anyone to target and enter Massachusetts to sell its aircraft.

Plaintiffs' reliance on Bartow v. Extec Screens and Crushers, Ltd., 53 F. Supp. 2d 518, 525-27 (D. Mass. 1999) is equally of no help. In Bartow, the Court found that specific jurisdiction existed in Massachusetts over a British manufacturer, Extec, which, unlike Socata, had "numerous direct contacts" with the Commonwealth, and which established and exercised control over the distribution channel that brought its products into Massachusetts. The Court found purposeful availment based on evidence that Extec conducted market research in Massachusetts to evaluate the potential for selling its machines there, used an agent to sell machines directly to Massachusetts purchasers, established a direct distributorship agreement with a U.S. distributor that included Massachusetts in its territory, and maintained bills of exchange on its machines that indicated Extec's "availment of Massachusetts contract and property laws." Id. at 519-20, 525-27. Such is not the case here, where Socata had no direct contacts with Massachusetts, did not maintain a direct

distribution agreement with Columbia, the dealer that included Massachusetts within its territory.

Salgado-Santiago v. American Baler Co., 394 F. Supp. 2d 394, 403, 405 (D.P.R. 2005) is similarly distinguishable. There, the Court found jurisdiction based on the fact that the defendant Ohio-based manufacturer had an authorized dealer in Puerto Rico (the forum) at the time of the injury to plaintiff which sold the same type of machine that caused the injury, and the manufacturer made service visits to Puerto Rico, including a visit to work on the very machine involved in the accident. Id. at 404 (" having a distributor in the forum, allowing the sale of your products in the forum, and performing service visits for said products constitutes the 'additional conduct' that the U.S. Supreme Court in Asahi envisioned as sufficient contacts to warrant a finding of purposeful availment."). Here, Socata has had no comparable presence in Massachusetts.

To the extent Plaintiffs argue that Socata purposefully availed itself of Massachusetts by intending and expecting that its products would be used generally in the United States,[13] the fact that a manufacturer's product could be used in a forum does not mean that jurisdiction over the manufacturer exists in every such forum. Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 85 (1st Cir. 1997). In Rodriguez, the Court declined to exercise jurisdiction under the stream of commerce plus theory despite the fact that the defendant knew that the entity to which it sold its rims incorporated them into tires that would be marketed and sold in distant forums, advertised in national publications that were disseminated in Puerto Rico, and filled orders from Puerto Rico. Id. at 84-85; see Tice v. Taiwan Shin Yeh Enter. Co., Ltd., 608 F. Supp. 2d 119, 123-25 (D. Me. 2009). Socata's mere awareness of a U.S. distribution network, and that Massachusetts was included in that

---

[13]Plaintiffs proffer evidence that the U.S. represents the largest market for Socata aircraft, that Socata got the TBM-700/850 series aircraft certified by U.S. authorities so that it can be flown in this important market, that Socata has occasionally attended air shows in the U.S., and that Socata provides promotional material for the U.S. market.

network, is insufficient to establish that Socata purposefully availed itself of Massachusetts specifically. To rule otherwise would essentially create nationwide jurisdiction over foreign manufacturers who have taken no action, aside from merely manufacturing and being aware that their product may indeed reach a particular forum, to purposefully avail themselves of a particular forum.

### 3. Reasonableness

Even assuming that Plaintiffs could satisfy purposeful availment and relatedness, they have not shown the reasonableness of subjecting Socata to this Court's jurisdiction. With respect to the first of the Gestalt factors, the defendant's burden of appearing, the Court finds that the burden on Socata would not be significant. Although the need to defend an action in a foreign jurisdiction "is almost always inconvenient and/or costly. . . this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir.1994), cert. denied, 514 U.S. 1108 (1995).

The second factor, concerning the forum state's interest in adjudicating the dispute, weighs heavily against keeping the lawsuit against Socata in Massachusetts. Socata is located in France, not Massachusetts. None of the Plaintiffs or the decedents whose estates they represent are from Massachusetts. Nor do these individuals have any connection to Massachusetts. Moreover, the alleged wrongful conduct by Socata – the defective design and manufacture of the TBM 700 aircraft – occurred entirely outside of Massachusetts and did not cause injury to any Massachusetts residents. The evidence shows that the only nexus between this litigation and Massachusetts is the location of the accident which "is not . . . enough to establish its substantial interest in [a] suit." Merced v. JLG Indus., Inc., 193 F. Supp. 2d 290, 295 (D. Mass. 2001); see Medicus Radiology LLC

v. Nortek Med. Staffing, Inc., No. 10-300, 2011 WL 9373, at *6 (D.N.H. Jan. 3, 2011) (reasonableness requirement favored dismissal where alleged tortious conduct occurred outside of forum). Moreover, in Sawtelle, which Plaintiffs suggest supports a finding of reasonableness, holds that "[t]his factor cuts against jurisdiction" when "the acts comprising the defendants' alleged negligence occurred almost entirely outside of [the forum]." 70 F.3d at 1395.

The third Gestalt factor to consider is the plaintiff's interest in obtaining convenient and effective relief. The First Circuit has repeatedly observed that "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." Sawtelle, 70 F.3d at 1395. However, this factor does not weigh in favor of maintaining the litigation in Massachusetts for the aforementioned reasons. Further, Plaintiffs' claim that Socata should be subject to personal jurisdiction in Massachusetts because several other defendants are subject to suit here is unavailing. (Pl. Opp. at 27 n. 8). Defendants EADS N.V. Socata North America, EADS North America, Inc., SimCom International, Inc. and SimCom, Inc. have already been dismissed from the Massachusetts action for lack of personal jurisdiction and Plaintiffs have initiated an identical parallel lawsuit over this accident against these defendants, including Socata, in Florida. See Newman v. EADS N.V., Case No. 6-09-CV-00193JA (M.D. Fla.).

The fourth Gestalt factor, concerning the judicial system's interest in obtaining the most effective resolution of the case, is generally considered "a wash." Hasbro, Inc. v. Clue Computing, Inc., 994 F.Supp. 34, 45-46 (D. Mass. 1997) (quoting Nowak, 94 F.3d at 719). However, because "it is unlikely that the parties will be able to resolve the dispute without judicial intervention in some forum" if the matter is dismissed here, "[t]he most efficient path for the judicial system ... is to move forward with the lawsuit in the present forum." Hasbro, 994 F. Supp. at 46.

The final factor concerns the interests of affected states in promoting substantive social policies.   Even if it could be arguably said that Massachusetts has some interest in the resolution of liability in a fatal crash that occurred in the Commonwealth, such consideration in this case does not outweigh the balance of the other Gestalt factors or tip the balance in favor of finding that the exercise of personal jurisdiction would be reasonable here.   Thus, on balance, the Gestalt factors weigh against the exercise of personal jurisdiction over Socata.

**VI.    Conclusion**

For the foregoing reasons, the defendant's motion to dismiss for lack of personal jurisdiction is GRANTED.

**So ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge